# CHARLESTON.

YEAGER EX'R *v.* MUSGRAVE, *et als.*

Submitted January 23, 1886.—Decided March 31, 1886.

1. If a stranger without the obligee's privity alters an agreement in a point not material, it does not avoid the agreement.    (p. 105.)

2. If an agreement containing mutual covenants is left by the parties thereto in the custody of a third person for safe keeping, and while it is in his custody, he alters it without the privity of any of the parties to the agreement, this will be regarded as an alteration of the agreement by a stranger, though such person had acted as the agent of one of the parties to the agreement by proposing the agreement to the other parties to it and in getting them to assent to and execute it.    (p. 109.)

*J. W. English* for appellants.

*C. E. Hogg* for appellee.

Statement of the case by WOODS, JUDGE:

Some time in the year 1867, Asa Musgrave, then quite an old man having only two children, a son E. G. Musgrave

and a daughter Mary E. who had inter-married with E. F. Roseberry, divided his farm, which was all the land he owned, into two parcels nearly equal in value and conveyed one parcel thereof containing 147 acres to his son, retaining the other as long as he lived, upon which he supported himself from its proceeds. In 1879, he departed this life having first made his last will, which on the 22nd of May, 1879, was duly admitted to probate; and Ambrose Yeager, the executor named therein, was duly qualified as such and took upon himself the execution of the will. By the terms thereof after providing for the payment of debts and funeral expenses he devised to his wife, Mary Musgrave, the use and control of the dwelling-house and other buildings on his farm and one third of the products thereof during her life, his son-in-law, E. F. Roseberry, to cultivate the farm during her life and pay to her one third of the proceeds thereof and also pay all the taxes and repairs thereon, for which he was to receive the remaining two thirds of such proceeds; but in the event he should refuse to do so, then the will further provided, that the testator's wife should rent the whole farm to such other person, as she might deem proper. By the third clause of his will he devised the said farm with its buildings and appurtenances at the death of his wife to his daughter Mary E. Roseberry and her heirs. The will made no disposition of his personal estate, as to which he died intestate.

Shortly before and, as it is alleged, at the time of his death he was the owner of the following notes: One by John Smith dated February, 1870, for $405.00; one by John Godley dated December 1, 1870, for $75.00; one by John S. Lewis dated May 15, 1870, for $75.00; one by Daniel Roush dated September 8, 1867, for $125.00; one by Samuel Somerville dated April 9, 1873, for $330.00; one by John R. Selbe dated May 29, 1881, for $58.00, and one by A. Yeager dated September 1, 1876, for $296.00, which on March 8, 1882, amounted in the aggregate of principal and interest to the sum of $2,171.11. John Smith's note on that day amounted to $697.41, and Somerville's to $506.55, amounting together to the sum of $1,203.96.

These notes at the death of the testator were found in the possession of E. G. Musgrave, who claimed, that they had

been given to him by the testator about a year before his death for the purpose of equalizing the division of his property between him and his sister, Mary E. Roseberry, as the land subsequently devised to her exceeded in value the land, which had been conveyed to him by the testator in 1867. As these notes had not been assigned to him, and as he was not then able by competent testimony to establish his right to retain them, acting under the advice of his counsel, when the executor demanded them as assets belonging to the estate of the testator, Musgrave surrendered the same to him under protest with notice, that he would thereafter claim the benefit of them.

The executor proceeded to sue for and collect the amounts due upon these notes and succeeded in collecting the larger portion thereof; but the execution issued upon the judgment recovered on John Smith's note was returned "no property found"; and whether the amounts of Somerville's note and of some others could be collected or not was doubtful.

In January 1882, Musgrave believing he was able to make good his claim to the said notes, which he had surrendered to the executor, filed his bill in the circuit court of Mason county against said executor, Mary Musgrave, widow of E. G. Musgrave, deceased, Mary E. Roseberry and E. F. Roseberry, claiming these notes upon the grounds before stated, averring that he had surrendered them under protest, and that since he had done so, he had learned that he could establish said gift by disinterested and competent evidence, which he did not know existed, when the notes were handed to said executor; and that he would not have surrendered the same, if he had known, that this evidence was in existence; and that since this discovery he has demanded from the executor the return of such of the notes, as have not been collected, and the payment of the amounts collected on the others by the executor, and prayed that the uncollected notes and moneys may be paid over to him and for general relief.

All the defendants answered the bill, Roseberry and wife jointly, Mary Musgrave and the executor separately. All admit the existence of the notes; that they had belonged to the testator, and were found in possession of and were claimed by E. G. Musgrave, and that he surrendered them to the

executor, who treated them as assets belonging to his testator's estate. The answers of Roseberry and wife and of Mary Musgrave explicitly deny, that there was any inequality in the value of the lands conveyed to E. G. Musgrave and of those devised to Mary E. Roseberry charged, as the latter are, with the maintenance of Mary Musgrave during her life. They also deny, that the plaintiff has any other or greater right to said notes or to the moneys mentioned in the bill, than such as he may have a as distributee of said estate.

To these answers general replications were filed.

Whether any depositions were taken in that cause does not appear.

On March 8, 1882, said E. G. Musgrave, Mary Musgrave, Mary E. Roseberry (by her maiden name of Mary E. Musgrave) and her husband E. F. Roseberry, entered into and executed the following agreement:

"An article of agreement entered into this 8th day of March, 1882, by and between Mary Musgrave and Mary E. Roseberry and E. F. Roseberry and E. G. Musgrave, wife and heirs-at-law of Asa Musgrave, deceased:

"That the said Mary Musgrave, wife of the deceased, and Mary E. Roseberry and E. F. Roseberry by virtue do agree to deliver a certain amount of notes of hand or the contents, principal and interest thereof, to E. G. Musgrave that he claims to be placed in his hands by his father Asa Musgrave, deceased, for his special benefit that said party of deliverers refused to give up to him as his property, and the notes herein mentioned are them—one note on John Smith of $405.00 and being the face of notes; one note on John Godley $75.00; one note on John S. Lewis $75.00 and note on Daniel Roush $125.00; one on S. W. Somerville $330.00; one on A. Yeager $296.00; Selbe one note $58.00; the above notes are the full number of notes that is claimed by E. G. Musgrave of said above mentioned heirs in controversy in the circuit court of Mason county, West Virginia; and the said parties do agree to draw the suit now pending in the court aforesaid and each to pay their own cost without further litigation, and if E. G. Musgrave has received any of said claims herein mentioned, and if so, we ask a credit on

said claims, and if he has not, we authorize Ambrose Yeager, executor of the estate of Asa Musgrave, deceased, to deliver the notes that are not collected and moneys that are collected on said notes in full of the notes herein mentioned that was not paid at the time that they were delivered to the appraisers, and that we, Mary Musgrave, Mary E. Roseberry and E. F. Roseberry, do relinquish all our rights to the claims herein mentioned; but we do not relinquish our claims to any money, bonds or other effects that is or may be in the hands of the executor hereafter of the present estate of Asa Musgrave, deceased; and I, E. G. Musgrave, do not claim only my interest in my mother's dower, Mary Musgrave, in moneys that *that* was left by my father Asa Musgrave, deceased, at her death (*and my interest in the residue what is left after this claim is paid*), if any — left of the present estate; and that I, E. G. Musgrave, do relinquish my claim to the one third of the products of the farm in possession of E. F. Roseberry that was left for the maintenance of my mother, Mary Musgrave, left by my father, Asa Musgrave, deceased, by said Roseberry keeping her; that all that may be a surplus, he is to have all the right to it forever, and this right of relinquish takes effect from this date.

" We parties do sign and seal this agreement in the presence of Joshua Fadely."

her<br>
" MARY X MUSGRAVE, [ SEAL. ]<br>
mark.<br>
" MARY E. MUSGRAVE, [ SEAL. ]<br>
" E. F. ROSEBERRY     [ SEAL. ]<br>
" E. G. MUSGRAVE.     [ SEAL. ]

"*Attest :*—JOSHUA FADLEY."

On May 12, 1882, the circuit court of Mason county entered in said cause the following order :

" E. G. MUSGRAVE *vs.* AMBROSE YEAGER, executor of Asa Musgrave, deceased, and others.—In chancery.

" This day the plaintiff presented to the court an article of agreement under seal, dated March 8, 1882, signed by the plaintiff, E. G. Musgrave and by the defendants Mary E. Musgrave, Mary Musgrave and E. F. Roseberry, and asked leave to file the same in the papers of this cause, to the filing of

which defendants objected, alleging the same not to be their act and deed, and tendered affidavits No. 1 and 2 in support of this objection, which are hereby filed, which objection is overruled and said agreement hereby filed; and thereupon plaintiffs moved the court to dismiss said cause, each party, plaintiff and defendants, paying his and their costs; to which defendants objected; and thereupon the plaintiff, on his own motion, has leave to dismiss this cause at his own costs, which is hereby accordingly done and said cause retired .from the docket of this court; and the plaintiff has leave to withdraw said agreement from said papers in this cause by leaving a certified copy thereof."

The affidavits Nos. 1 and 2 referred to in said decree were made by said Mary Musgrave and E. F. Roseberry and are as follows :

AFFIDAVIT No. 1.

"STATE OF WEST VIRGINIA, MASON COUNTY, TO-WIT:

"Personally appeared before me, J. A. Gibbons, a notary public in and for the county aforesaid, Mary Musgrave, who being duly sworn according to law, says that she is the Mary Musgrave who is one of the defendants in a certain suit in chancery in the circuit court of said county wherein E. G. Musgrave is plaintiff and Ambrose Yeager and others are defendants.

"Affiant further says that she signed a certain writing purporting to be an article of agreement drawn by one Joshua Fadely and dated March 8, 1882, which purported to be a basis of adjustment of the matters in litigation in said suit; but affiant further says that her signature to said writing was procured by the said Fadely representing to her that she and Mary E. Roseberry and E. F. Roseberry were only thereby binding themselves to release to the said E. G. Musgrave their right and title to a sum of money not exceeding $700.00 now in the hands of Ambrose Yeager, as executor of the estate of Asa Musgrave, deceased, said sum to be taken from the said estate ; and also one note on J. P. R. B. Smith of $405.00, and the unpaid balance of $178.00 of a note on S. W. Somerville, which representation this affiant afterward ascertained was untrue ; whereupon she immediately notified the parties interested that she wholly rescinded and re-

pudiated the said pretended agreement and that she would not be bound by any of its provisions.

"Affiant further says that had it not been for the false representations thus made to her, and had she known the full purport and effect of said writing, she would not have signed the same.

"She further says that the said Fadely knowingly withheld and concealed from her the true meaning, purport and effect of said writing, and permitted her under said delusion and mistake to sign said instrument, and that after she had signed it he either changed it or permitted it to be changed by interlineation without her consent or knowledge.

"MARY X MUSGRAVE.
her
mark.

"Signed in the presence of—

"J. P. ROSEBERRY.

"Subscribed in my presence and sworn to before me on March 31, 1882.

"J. A. GIBBONS,
"Notary Public M. C., W. Va."

AFFIDAVIT NO. 2.

"STATE OF WEST VIRGINA, MASON COUNTY, TO-WIT:

"Personally appeared before me, one J. A. Gibbons, a notary public in and for the county aforesaid, E. F. Roseberry, who being duly sworn according to law, says that he is one of the defendants in the suit of E. G. Musgrave against Ambrose Yeager, executor, &c., and others now pending in chancery in the circuit court of Mason county, West Virginia.

"Affiant further says that on or about March 8, 1882, one Joshua Fadley came to his house representing himself as having been sent by said E. G. Musgrave to compromise the above mentioned suit.

"Affiant further says that he objected to making the compromise proposed by said Fadley, but that said Fadley had so worked upon the feelings of Mary Musgrave by certain representations that she was very much excited, being in feeble health, and wished affiant and his wife to try and make settlement of the matter in said suit without further litigation, whereupon affiant asked said Fadley what terms he was

there to propose. Fadley made many and incongruous statements, but as a suming up and as the result of his much talk, the defendants, this affiant, Mary E. Roseberry and Mary Musgrave, were to release to E. G. Musgrave their interest in a sum of money not exceeding $700.00 of the estate of the late Asa Musgrave, deceased, and also one note of J. P. R. B. Smith and the balance of one note on S. W. Summerville.

Affiant further says that he agreed to sign an article of agreement to that effect, and that he signed a certain writing drawn up by said Fadley with the understanding that such was its purport and effect.

"Affiant further says that immediately after learning that the said writing did not properly state the aforesaid understanding, but that the legal purport and effect was different from what it was represented to this affiant and Mrs. Mary Musgrave and Mary E. Roseberry, he notified the parties in interest that he fully and wholly repudiated the same and would not be bound by its provisions.

"Affiant further says if he had known the true nature and effect of said writing he would not have signed it.

"Affiant further says that when he last saw said writing it was not in form and words as when it was signed by himself and co-defendants, but that it had been changed by interlineation, &c.

"E. F. ROSEBERRY.

"Sworn to and subscribed before me April 29, 1882.

"J. A. GIBBONS,
"*Notary Public M. C., W. Va.*"

After the execution of said article of agreement, and before E. G. Musgrave had dismissed his suit, Mary Musgrave, Mary E. Roseberry and E. T. Roseberry served written notices upon Ambrose Yeager, the executor of Asa Musgrave, forbidding him to deliver to E. G. Musgrave any of said notes or to pay to him any of the moneys collected thereon, as they claimed that no valid compromise or adjustment of said suit had been made, and that they would hold him and his sureties responsible for such part thereof, as they may be entitled to receive.

Under these circumstances the executor on the first Mon-

day in July brought this suit against E. G. Musgrave, Mary Musgrave, E. F. Roseberry and Mary E. Roseberry and in his bill alleged in substance, that as such executor he had obtained from E. G. Musgrave said notes in the manner and under his protest, as herein stated, and had collected the same, as far as practicable, and had in his hands the uncollected notes and the proceeds of such collections and was ready to pay the same to the parties entitled thereto, but that he was unable to determine, which of the claimants was entitled thereto, and in what proportions he ought to disburse the same, and prayed that said claimants might be compelled to establish their respective rights thereto, and that he might be directed by the court in the distribution thereof.

All the defendants answered the bill. E. F. Roseberry and wife in their answer avowed in substance the same facts in regard to the ownership of said notes, as they had avowed in their answer to the bill of E. G. Musgrave, which had been dismissed, and further that they are entitled to their distributive share of the proceeds of said notes, notwithstanding the fact, that they entered into said agreement by way of compromise dated March 8, 1882. The reasons assigned, why they were not bound by said agreement, were in substance, that Mary Musgrave was aged, frail and very nervous, and greatly distressed on account of this lawsuit; that one Fadley an agent of E. G. Musgrave visited their house, advised a compromise, to save costs and useless waste of money and to avoid exposure of matters that would be unpleasant, and stated they would eventually lose the suit and have a large amount of costs to pay; that he made calculations as to the amount this female respondent was to allow said executor to pay over to E. G. Musgrave, out of the moneys in his hands, and he pretended that something between $600.00 and $700.00 would be all the money the executor would be authorized to pay over to E. G. Musgrave, if the matter was settled, as he suggested; and that at the request of Mary Musgrave said Fadley again represented, that not more than $700.00 in money *and the notes of said Smith and Somerville*, yet unpaid would have to be turned over to E. G. Musgrave by virtue of said agreement; that upon that basis they agreed to settle said

suit; and thereupon Fadley proceeded and pretended to reduce said agreement to writing. They further averred, that they were very ignorant in regard to legal matters and technical terms, and that, after the paper was prepared by Fadley, they told him, they could not clearly understand said writing, and they asked him, if it carried out their agreement, and he said it did, and that it would be much better for all to sign it. They further aver, that, since they executed said agreement, it had been materially changed without their knowledge or consent, and that by reason thereof and of the fraud and misrepresentation used and employed by Fadley as the agent of Musgrave they were not bound by said agreement of compromise.

The answer of Mary Musgrave is substantially the same in every material point as that of Roseberry and his wife.

The answer of E. G. Musgrave avers substantially the same character of claim to these notes and to the money collected thereon, as were contained in his bill, which he dismissed, after the article of agreement compromising the matter in controversy therein had been executed; and he relies and insists upon the binding force of said agreement. He avers, that he performed his part of said agreement, and claims under and by virtue of its terms the said notes and the proceeds thereof. He admits the alteration in said agreement but denies, that the same was in regard to any material matter, and avers, that the alteration made therein was so made without his authority, knowledge or consent, and that he is not bound nor any of his rights impaired by the unauthorized act of a stranger; and he asks that the executor be required to turn over the uncollected notes and the money collected on the others.

The alteration made in said article of agreement, is on page 94 and is in these words: "*and my interest in the residue what is left after this claim paid,*" inserted between the words "death" and "it." This alteration was in fact made by Fadley, who was the custodian of the writing, a few days after it was executed, without the knowledge of any of the parties without any fraudulent intent, but because he was of opinion that without them the agreement did not clearly express all the terms of the agreement.

A large number of depositions were taken by both sides upon the questions properly arising upon the pleadings in the cause, that had been dismissed; but from the view I have taken of the case now under consideration, I deem it unnecessary to express any opinion in regard thereto or in regard to the facts sought to be established thereby.

The real question and, it seems to me, the only material question for consideration is, whether the said article of agreement dated the 8th of March, 1882, is valid and binding on the parties thereto. If it is, then E. G. Musgrave is entitled to the whole of said notes or the proceeds thereof; and if not, then he is only entitled to his distributable share thereof as one of the distributees of Asa Musgrave, deceased. A large number of depositions were taken on both sides of this question, to which I will hereafter refer.

On February 24, 1883, the cause came on to be heard, upon the bill and exhibits filed therewith, the answers thereto and exhibits filed with them, replications thereto and depositions and argument of counsel. On consideration whereof it was in effect among other things adjudged, ordered and decreed, that said alteration in said agreement being the unauthorized act of a stranger is void and of no effect and shall in no wise operate to prejudice the rights of any or all the parties to this suit; and that the defendant, E. G. Musgrave, is entitled to the said notes and to the moneys collected thereon, and that the same, or any of them in possession of said executor shall be surrendered to him; and if said plaintiff does not surrender said notes to E. G. Musgrave, it was further adjudged, ordered and decreed, that he pay to him the proceeds of the notes not surrendered, and where judgments have been obtained on any of said notes, he shall assign the same to him, for all of which said executor should have credit in the settlement of his accounts as executor of Asa Musgrave, deceased, but said executor shall be allowed no commissions upon the aggregate amount of said notes or their proceeds.

And the court further adjudged, that the costs of this suit be paid to the plaintiff out of the assets in his hands as such executor; and the plaintiff was directed and required to make a final settlement before John E. Timms, one of the com-

missiouers of the court, of his accounts as executor aforesaid and make report thereof to the court.

From this decree the defendants, E. F. Roseberry, Mary E. Roseberry and Mary Musgrave, obtained an appeal to this Court.

Opinion by GREEN, JUDGE:

The bill in this cause was a bill in the nature of a bill of interpleader filed by Ambrose Yeager, executor of Asa Musgrave, alleging, that he had in his hands as such executor certain bonds and notes and the proceeds of certain other bonds and notes payable to his testator, which he had received after his death from E. G. Musgrave, the son of his testator, who claimed that they had been given to him by the testator about a year before the testator's death as a gift so as to make the amount, which he would receive from the testator, his father, including a tract of land of nearly 150 acres conveyed to him by his father, equal in value to the residue of the testator's land which he intended to devise after his wife's death to his daughter Mary E. Roseberry, and which he did devise to her. The bill further alleged, that after the plaintiff had received from E. G. Musgrave these bonds and notes, the said Musgrave brought a suit in chancery in the circuit court of Mason county against him as executor and against the distributees, Mary Musgrave, the widow, and Mary E. Roseberry, the daughter of Asa Musgrave, the husband of the latter, E. F. Roseberry, being also made a defendant, to recover from him the proceeds of these notes, all being particularly described in his bill, which had been collected by him, and for the return to the said Musgrave of such of them as had not been collected, which notes had, it was alleged, been delivered to him under protest, because the said Musgrave did not know, that he could prove, that they had been given to him by his father in his lifetime, which he was now prepared to do; that the answers of the defendants denied, that Musgrave's father ever gave him the notes, and alleged, that they were placed in his hands to collect for his father's use; that while this suit was pending, the parties entered into an agreement under seal, whereby said suit was to be dismissed, one of the promises of agree-

ment being that the plaintiff in said suit was to have the said notes and moneys, which he claimed in said chancery cause; that said suit after this agreement was dismissed; that defendants in said suit had notified him not to pass over said notes and bonds to Musgrave nor to pay him any of the proceeds of these notes, which he collected, as had been agreed by this compromise-agreement, as they did not consider it valid or binding on them; that on the other hand Musgrave had notified him, that unless he paid over the money collected on these notes and returned to him these notes according to the terms of this compromise-agreement, he would sue him. The prayer of the bill is that this controversy may be settled, and a decree be entered by the court directing the plaintiff what to do in the premises.

The answers of the widow, Mary Musgrave, and of her daughter, Mary E. Roseberry, ask, that this agreement of compromise may be deemed to be null and void; first, because it was obtained from them by fraud and imposition on the part of E. G. Musgrave, and second, because, after it had been executed, it had been fraudulently interlined so as to make a material alteration in its meaning by the agent of the other party to the agreement, E. G. Musgrave.

The evidence shows clearly, that no fraud was practiced by Musgrave or by his agent, Fadley, in procuring the execution of this agreement. The facts were, that Fadley as agent for Musgrave at his request went to the residence of the other distributees of his father's estate to procure, if possible, from them an agreement, that on the dismissal of this suit they would let him have these bonds and notes, and the proceeds of such of them as the executor had collected. They were unwilling to assent to this; but after mature consideration on being told by Fadley, as they themselves in their depositions say, that in making the proposed agreement they would surrender only about $700.00 and two notes one of J. Smith and one of S. W. Somerville, they consented to execute the proposed agreement. One of the grounds, on which they claim to have this agreement set aside as fraudulent is, that Fadley as the agent of Musgrave misrepresented to them the amount, which they would surrender by entering into the proposed arrangment. But there was

really no misrepresentation or misunderstanding in the matter. These two notes, as the statement of this case shows, amounted with interest on March 8, 1882, the date of this agreement to $1,203.96, and all the other notes and bonds claimed by Musgrave amount with interest on that date to $1,967.15, of which two thirds or $644.77 would be coming to the widow, Mary Musgrave and her daughter, Mary E. Roseberry, as two of the distributees of the estate of Asa Musgrave, he having by his will made no disposition of his personal estate. So that the amount really surrendered by them in addition to these Smith and Somerville notes was only $744.77. There was no imposition on them according to the statement in their own depositions as to the amount, which they would surrender by entering into the proposed agreement.

After carefully examining all the evidence in reference to what preceded the execution of this agreement of March 12, 1882, whereby the matters in controversy in this chancery-suit then pending in Mason county was settled, I can see no evidence of fraud, misrepresentation or duress, for which this agreement could be set aside by the court. It is true, that one of the parties to it, Mary Musgrave, was a very aged woman some seventy-six years old and was quite infirm, but when the proposal of this agreement was made to her by Fadley, the agent of E. G. Musgrave, it was made not to her only but also to her daughter, Mary E. Roseberry and her son-in-law E. F. Roseberry, who really knew more about the subject-matter of the proposed agreement than did Fadley. What was proposed was, that they should agree to permit E. G. Musgrave to have the bonds and notes, which in a chancery-suit then pending he claimed, that his father Asa Musgrave in his lifetime had given to him. This suit had been pending some two months; and in the bill Musgrave set out in detail each of the bonds and notes, which he claimed had been given him by his father, its date and amount, and this bill the defendants had all answered on oath. These and these only were the bonds and notes, which in the proposed agreement the other parties to it, defendants in the suit, were to surrender. It would seem to be very unreasonable in them to ask that this agreement should be set aside, be-

cause they were imposed upon by Fadley as to what would be the loss they would sustain by giving up their claim to these notes and bonds. They had far better opportunity of estimating it than Fadley, the agent of Musgrave, with whom this agreement was really discussed and consented to.

Asa Musgrave had then been dead nearly three years, and during all that time his son had been asserting his claim to these notes; and it does seem to me the court could not listen to an allegation, that the widow and daughter of Asa Musgrave were misled as to the amount they were surren- dering, when they agreed that E. G. Musgrave should have these bonds and notes and the proceeds of such as had been collected.

The evidence shows, that, while the widow and her daughter, Mary E. Roseberry, were willing to give to E. G. Musgrave all he claimed in the chancery-suit, they were apprehensive, that the proposed agreement might in some way operate a surrender by the widow of something, which had by the will of Asa Musgrave been devised to her, or a relinquishment of some of the moneys, which she had received from her husband's executor or might have a right to receive as a distributee; and she insisted, that provisions should be put in the agreement, which would effectually prevent this. It is obvious, that Fadley, who drew the agreement, in inserting these provisions wished it distinctly understood, that E. G. Musgrave, his principal, did not intend to surrender his supposed interest in the money, which Mary Musgrave, the widow, had received or should receive from the executor of her husband, as a distributee after his mother's death. He evidently thought, that on the widow's death her son E. G. Musgrave, and her daughter Mary E. Roseberry would each be entitled to one half of all the personal estate, which she as widow and distributee had received from the estate of her deceased husband. This, he took care to insert in the agreement, he still claimed, though he relinquished his imaginary claim on the real estate or to the products of the real estate devised by the will of Asa Musgrave to his widow for life. After this agreement of March 12, 1882, had been executed by all the parties it was left by mutual consent in the hands of Joshua Fadley, who drew it; and a few days

after it was thus left in his possession, he altered it by inter-
lining it as set out in the statement of the case preceding
this opinion. This interlineation is in italics, so that it may
be readily noticed. It was inserted by Fadley in much
blacker ink than that used in the agreement itself, and was
not inserted with the fraudulent purpose of imposing on the
parties to the agreement by making them believe it was in
the agreement when signed. But it was inserted, because,
he thought, it would prevent a misunderstanding of the real
meaning to the agreement. It was an obvious interlineation
of what was not in the original agreement, as is apparent
upon an inspection of the paper, and it was never dis-
puted.

This interlineation was made without the knowledge or
consent of any of the parties to the agreement. It is in-
sisted by Mary E. Roseberry and her husband, E. F. Rose-
berry, that it is a material alteration, which renders void the
entire agreement, while E. G. Musgrave insists, that it is an
immaterial alteration. To determine whether it is a material
or immaterial alteration, it is necessary to determine the true
meaning of the agreement, before such alteration was made.
The agreement is set out in full in the statement of the case
preceding this opinion, and this alteration is included in paren-
thesis and is italicized, so that it may be readily observed. See
p. 94. The first part of this agreement though very badly
expressed is perfectly intelligible, when considered in connec-
tion with the circumstances surrounding the parties, when it
was executed, and is set out at length in the statement of the
case and detailed to some extent in this opinion. Its mean-
ing is obviously, that the defendants to this chancery-suit
brought by E. G. Musgrave, one of the parties to the agree-
ment, against Mary Musgrave, Mary E. Roseberry, whose
name was by a blunder signed Mary E. Musgrave, her
maiden name, and E. F. Roseberry her husband the other
parties to the agreement, and the executor of Asa Musgrave,
then pending in the circuit court of Mason county would
acknowledge the claims and demands of the plaintiff in said
chancery-suit and that they would authorize and direct the
executor of Asa Musgrave to deliver to E. G. Musgrave all
the bonds and notes, which in said suit he claimed that his

father Asa Musgrave had given to him as a gift in his life-
time, and that the said chancery-suit should be dismissed
agreed, each party paying his own costs.

The balance of this agreement was when executed in these
words: "but we (Mary Musgrave and E. F. Roseberry and
Mary E. Roseberry) do not relinquish our claim to any mon-
eys, bonds or other effects that is or may be in the hands of
the executor hereafter of the present estate of Asa Musgrave,
deceased; and I, E. G. Musgrave, do not claim only my in-
terest in my mother's dower, Mary Musgrave, in moneys
that was left by my father Asa Musgrave, deceased, at her
death (and my interest in the residue what is left after this
claim is paid), if any — left of the present estate; and that
I, E. G. Musgrave, do relinquish my claim to the one third of
the products of the farm in possession of E. F. Roseberry
that was left for the maintenance of my mother, Mary Mus-
grave, left by my father, Asa Musgrave, deceased, by said
Roseberry keeping her; that all that may be surplus, he is to
have all the right to it forever, and this right of relinquishment
takes effect from this date." What is the true meaning of
this agreement? It is very obscure certainly. But though
so very obscure I think it can be interpreted and its meaning
ascertained, if we consider in connection with it all the cir-
cumstances surrounding the parties, when they executed the
agreement, which we have of course a right to consider.
(*Crislip, Guardian* v. *Cain*, 19 W. Va. 442, syll. 19; *Depue* v.
*Sergent*, 21 W. Va. 327, point 4 syll.; *Handsford* v. *Coal Co.*,
22 W. Va. 71, point 5 of syll.; *Transportation Co.* v. *Pipe
Line Co.*, 22 W. Va. 614; *Findley* v. *Armstrong*, 23 W. Va.
126; *Kerr* v. *Hill*, 27 W. Va. 608).

Asa Musgrave, the father of the wife of E. F. Roseberry
and E. G. Musgrave, died in 1879 leaving a will, in which
he made no disposition of his personal property, and which
therefore on his death went to his distributees one third to
each. These distributees were Mary Musgrave, his widow,
E. G. Musgrave, his son, and Mary E. Roseberry, his daugh-
ter, who was the wife of E. F. Roseberry, all of whom were
parties to this agreement. By his will he provided:

"First.—It is my will and desire that my dear wife Mary
Musgrave shall occupy and control my dwelling house and

other buildings upon my home farm in Robinson township, Mason county, West Virginia, and receive and enjoy for her own use one third of the products of said farm during her natural life.

"Second.—It is my will and desire that my son-in-law E. F. Roseberry shall cultivate my said farm during the life of my said wife and pay over to her one third of the proceeds thereof, and in the event the said Roseberry declines or refuses to cultivate said farm, then it is my wish that my said wife shall rent said premises to such other party or parties as she may deem proper, but while said Roseberry does cultivate said farm, it is my wish and desire that he shall have two thirds of the products of the same, he paying taxes and repairs of the farm.

"Third—It is my wish and desire that my daughter Mary E. Roseberry and her heirs shall have my said farm, with its buildings and appurtenances, at the death of my said wife Mary Musgrave."

E. F. Roseberry after the death of his father-in-law cultivated the farm on the terms set out in this second clause of this will.

The last clause in this agreement is : "I, E. G. Musgrave, do relinquish my claim to the one third of the products of the farm in possession of E. F. Roseberry, that was left for the maintenance of my mother, Mary Musgrave, left by father, Asa Musgrave, deceased, by said Roseberry keeping her; that all that may be a surplus, he is to have all the right to it forever, and this right of relinquish takes effect from this date." It is evident, that the writer of this agreement, Joshua Fadley, who was a grossly ignorant man, and the parties to the agreement had some notion, that, if one third of the products of the farm were more than sufficient to support the widow, Mary Musgrave, her children would be entitled to the surplus, and that E. G. Musgrave, one of her children, would be entitled to half of this surplus, and by this last clause in this agreement he agrees to relinquish his share of this surplus in the farm products and to let E. F. Roseberry have it. Of course he had no pretence of claim of any kind to this surplus, and this last clause of the agreement is wholly inoperative. It is only useful in interpreting

the preceding clause, which is, "And I, E. G. Musgrave, do not claim only my interest in my mother's dower, Mary Musgrave, in money left by father, Asa Musgrave, deceased, if any, left of the present estate."

As I understand this clause, as E. G. Musgrave had a notion that he had a right to one half of the surplus of the one third of the crops upon the farm after his mother's support, which in the last clause of this agreement he agreed to relinquish in favor of his brother-in-law, E. F. Roseberry, so he had a notion, that he might have a like interest or some sort of interest in the moneys which his father's executor had paid or might pay to his mother, Mary Musgrave, as a distributee of Asa Musgrave. This money so paid to her or to be paid to her as distributee by her husband's executor, the ignorant writer of this agreement calls her dower, and like the dower-land he conceived, that on the death of the widow it would go to the children of the intestate, and that E. G. Musgrave would then be entitled to one half of it. He therefore in this clause of the agreement declares, that in whatever his mother may in any manner get from his father's estate in land or its products or in money, which is all called her dower, he claims only his interest at his mother's death in the moneys she may receive from the executor of his father and no present interest *in these moneys* and no interest in the products of the farm, which she is receiving, either now or in any surplus of these products at her death.

Of course all these provisions in this agreement are a mere nullity, as E. G. Musgrave had no kind of interest either in the money, which she might receive as distributee, or in the land or the products of the land devised to his mother, Mary Musgrave; and all these declarations of his claims thereto or relinquishment thereof are mere nullities. When it is borne in mind, that the object of this agreement was simply to end the controversy, which was then pending in the circuit court of Mason county in the chancery-suit, and that this was intelligibly settled by the first part of the agreement, but that out of abundant caution the ignorant writer of this agreement adds first this useless clause "but we (Mary Musgrave, Mary E. Roseberry and E. F. Roseberry) do not relinquish our claims in any money, bonds or other effects, that is or

may be in the hands of the executor hereafter of the present estate of Asa Musgrave, deceased," and he then adds these foolish and idle provisions in relation to E. G. Musgrave's imaginary interest in what he calls his mother's dower, this declaration, that they did not relinquish their interest in the residue of the personal estate of Asa Musgrave, was of course entirely unnecessary, and without this clause or these clauses about what is called the widow's dower neither adds to nor subtracts from the agreement which had been previously set forth.    They were added doubtless to make clearer the agreement of the parties but only tended to render it obscure; but as they legally have no effect, they leave the agreement just what it was before they were inserted.

In exactly the same spirit, to render plainer the meaning of the agreement, the writer of it, Joshua Fadley, who had the control of it by consent of all parties, after it had been executed several days, without the knowledge or consent of any of the parties inserted the clause, which he interlined, and which has been heretofore stated. (Page 94).    Its obvious meaning is : I, E. G. Musgrave, also claim my interest in the residue of my father's personal estate, after the claim to the notes he gave me in his lifetime has been satisfied by the surrender of them and by· the payment to me of such money as has been collected on any of them."    As he had not relinquished any interest of any sort, which he had in his father's personal estate, it was of course an idle and unnecessary act in Joshua Fadley to make the interlineation. · The agreement, after this interlineation was made, meant exactly what it did before.    It was therefore an immaterial alteration.

It is claimed by appellant's counsel that Joshua Fadley in making this interlineation was acting as the agent of E. G. Musgrave and that therefore the court should regard it as the act of Musgrave himself, especially as in his answer he claims the benefit of this agreement without saying that in asking for its benefit he did not adopt this interlineation made by his agent Fadley.    This seems to me to be entirely unsustained by the record in the cause.    The agency of Fadley obviously terminated, when the agreement was executed by all the parties.    After that it was left in the hands of Fadley as

the keeper of the paper for all of the parties to the agreement and while so acting as the keeper of this agreement for all the parties to it he made this interlineation in it without the knowledge or consent of any of them. Nor did E. G. Musgrave seek by his answer to obtain any benefit from this alteration in the agreement. In the first place in his answer he insisted, that it was an immaterial alteration, and so far from attempting to get an advantage from it he expressly admits, that the alteration or interlineation was made by Fadley, and states the exact circumstances, under which it was made; and his general prayer at the end of his answer, that said written agreement be enforced against his co-defendants, certainly can not be regarded as asking, that the agreement as improperly altered should be enforced.

If it were necessary to refer to any authority to establish this position, that when Fadley altered the agreement, he was not the agent of E. G. Musgrave, I might refer to the case of *Hunt* v. *Gray, Jr.*, 35 N. J. Law (6 Vroom) 232. The facts in that case were: John F. Hunt as agent for the plaintiff sold for him a horse and took for it a note, which he carried to the plaintiff and then the plaintiff entrusted him with this note for the purpose of having it discounted for the plaintiff's use in a bank. Hunt altered the note, while it was in his custody, and after it was so altered, it was discounted by the bank, and the proceeds went to the credit of the plaintiff. It was held, that the alteration of the note was not properly an act appertaining to the transaction, to which his agency extended; and that the act must therefore be regarded, as though done by a stranger. There was in that case far stronger ground for holding Hunt to be the agent of the plaintiff in the alteration of this note, than there is for holding Fadley to be the agent of E. G. Musgrave in the alteration of the agreement in this case. In truth there would be no more propriety in holding Fadley the agent of E. G. Musgrave in altering this agreement than in holding any other person, who by mutual consent had the custody of a mutual agreement between two parties, and who might alter it without the knowledge or consent of either, to be the agent in so doing of one of the parties and not of the other. And this, it strikes me, would be absurd.

The alteration of an agreement or any written instrument, if made by the obligee in a material matter without the assent of the obligor, it is universally agreed, destroys the agreement. (*Newell* v. *Maberry*, 3 Leigh 250 ; *White* v. *White*, 2 Halstead (N. J.) 175 ; *Burham* v. *Ayer*, 35 N. H. 351 ; *Davis* v. *Coleman*, 7 Ired. L. (N. C.) 424 ; *Marcedy* v. *Dunlap*, 5 Lans. (N. Y.) 365 ; *Mills* v. *Starr*, 2 Bailey 359 ; *Pigot's Case*, 11 Rep. 27 *a* ; *Weeks* v. *Maillerdet*, 14 East 568 ; *O'Neale* v. *Long*, 4 Cranch 60 ; *Steel's Lessee* v. *Spencer*, 1 Peters 560 ; *Barrington, &c.* v. *Bank of Washington*, 14 S. & R. 423 ; *Chesley* v. *Frost*, 1 N. H. 148 ; *Johnson* v. *Bank of U. S.*, 2 B. Mon. 311 ; *Miller* v. *Stewart*, 9 Wheat. 708 ; *Arrison* v. *Harmstead*, 2 Barr 194. And there are many decisions holding, that the alteration of a deed or agreement by the obligee without the knowledge or consent of the obligor even in an immaterial part avoids the deed or other instrument. (*Pigot's Case*, 11 Rep. 27 *a* ; *Lewis* v. *Page*, 8 Cow. 73 ; *Moore* v. *Beckham*, 4 Binn. 1 ; *Johnson* v. *Bank of U. S.*, 2 B. Mon. 311 Dend. ; *White* v. *White*, 2 Halst. 175 ; *Mollett* v. *Wacherbarth*, 5 C. B. 181 ; *Boult* v. *Brown*, 13 Ohio St. 364). But on the contrary it has been held in many cases, that an immaterial alteration in an agreement of any sort will not avoid it, though it be made by the obligee or payee without the assent or knowledge of the obligor or makers. (*Perquawket Bridge* v. *Mathes*, 8 N. H. 139 ; *Bowers* v. *Jewell*, 2 N. H. 543 ; *Nichols* v. *Johnson*, 10 Conn. 192 ; *Van Horn and Clark, administrators* v. *Bell*, 11 Ia. 465 ; *Aldonis* v. *Cornwell*, L. R. 3 Q. B. 573 ; *Falmouth* v. v. *Roberts*, 9 M. & W. 469 ; *Smith* v. *Crooker*, 5 Mass. 540 ; *Hunt* v. *Adams*, 6 Mass. 519 ; *Langdon* v. *Paul*, 20 Vt. 217 ; *Harrington* v. *Finch*, 3 Ohio St. 445).

In many cases it has been held, that a material alteration of a deed or other agreement by a stranger without the knowledge of either party would avoid the deed. (*Pigot's Case*, 11 Rep. 27*a* ; *Davidson* v. *Cooper*, 11 M. & W. 738, and *Davidson* v. *Cooper*, 13 M. & W. 352 ; *Dew* v. *Wright, &c.*, 2 Halst. 177 ; *Burchfield* v. *Moore*, 3 Ell. & B. 683, (25 L. & Eq. 123) ; *Gardner* v. *Walsh*, 5 Ell. & Bl. 82, (32 Eng. L. & Eq. 162) ; *Powell* v. *Divett*, 15 East 29 ; *Mollett* v. *Wacherbarth*, 5 C. B. 181). But many other courts hold, that the altera-

tion of a deed or other agreement by a stranger in a material part will not avoid the instrument, if it can be shown by evidence what the instrument was before altered. So held by the Irish Courts (*Swiney* v. *Barry*, 1 Jones 109), and by many courts in the United States. (*Nichols* v. *Johnson*, 10 Conn. 192; *Russ* v. *Overbaugh*, 6 Cow. 746; *Lewis* v. *Payne*, 8 Cow. 71; *Madlin* v. *Platte County*, 8 Mo. 235; *Davis* v. *Carlisle*, 6 Ala. 707; *Warfing* v. *Smith*, 3 Barb. 404; *Jackson* v. *Malin*, 15 Johns. 203; *City of Boston* v. *Benson*, 12 Cush. 61).

It is universally agreed, that, if a bond, deed or other agreement be altered in an immaterial part by a stranger without the privity or knowledge of the obligor it will not avoid the deed or other instrument. (*Pigot's Case*, 11 Rep. 27*a*; *U. S.* v. *Hatch, &c.*, 1 Paine 342; *State* v. *Miller*, 3 Gratt. 339; *Waugh & wife* v. *Bussell*, 5 Taunt. 707, (1 Eng. Com. L. R. 241); *Trew* v. *Burton*, 1 Cr. & Mee. 533, 535; *Henfru* v. *Bromley*, 6 East 309).

These cases show, that there is much uncertainty in many cases as to the effect, which an alteration of an agreement will produce; and that under certain circumstances some of the courts would hold a deed avoided by such alteration, while under the same circumstances other courts would not hold the agreement void by reason of such alterations. But all the courts, as we have seen, are agreed upon two propositions, one, that if the obligee in an agreement alter it without the knowledge of the obligor in a material part, such alteration will render the agreement void; the other, that if a stranger alter an agreement in an immaterial manner and without the privity of the obligee, such alteration will not avoid the agreement.

We have seen, that the case before us belongs to this last class. The agreement was altered by Joshua Fadley in an immaterial manner, and when he made this immaterial alteration, he was a stranger to the agreement, he not being then the agent of the obligee in the agreement. Our conclusion therefore is, that this agreement is valid and binding on the defendants, Mary Musgrave and E. F. and Mary E. Roseberry, it not having been procured by fraud or duress nor avoided by the alteration of it made after its execution.

We are therefore of opinion, that the decree of the court

below rendered on February 24, 1883, should be affirmed, and that the appellants should pay to the appellees their costs about their defence in this Court expended and $30.00 damages, and that this cause should be remanded to the circuit court of Mason county with instructions that it be further proceeded with according to the principles governing courts of equity.

Affirmed.   Remanded.

# CHARLESTON.

